| | |
|---|---|
| EYEBOBS, LLC, a Delaware limited liability corporation, | Case No. 16-CV-4276 (PJS/DTS) |
| Plaintiff, | |
| v. | ORDER |
| SNAP, INC., a Delaware corporation, | |
| Defendant. | |

James R. Steffen, FAEGRE BAKER DANIELS LLP, for plaintiff Eyebobs, LLC.

Dennis L. Wilson and Christopher T. Varas, KILPATRICK TOWNSEND & STOCKTON LLP, and Kristen G. Marttila, LOCKRIDGE GRINDAL NAUEN P.L.L.P, for defendant Snap, Inc.

This is a trademark-infringement action brought by plaintiff Eyebobs, LLC ("Eyebobs"[1]) against defendant Snap, Inc. ("Snap"). Eyebobs designs and sells reading glasses, including reading sunglasses. Eyebobs owns an incontestable registered trademark (Registration No. 3484578) protecting a mark consisting of an oval, upward-looking, black-and-white cartoon eyeball placed above the word "Eyebobs." The Court will refer to this mark as the "Registered Mark." The Registered Mark is typically displayed against a golden-yellow background. Eyebobs also claims that it has an

---

[1] The term "Eyebobs" appears in all lower-case letters when used in commerce. To improve readability, however, "Eyebobs" will be capitalized in this order.

unregistered, common-law trademark protecting a mark consisting of the eyeball design itself—that is, the eyeball logo unaccompanied by the word "Eyebobs." The Court will refer to this (claimed) mark as the "Common-Law Mark."

Snap owns the popular Snapchat mobile application (or "app"), which allows users to take photos and videos and send them to other Snapchat users. Snap is in the process of launching a new product called "Spectacles." Spectacles are sunglasses with a built-in camera in the upper right corner (near where the right temple connects to the right end piece). Photos and video that are captured by the camera are wirelessly transmitted to a smart phone on which the Snapchat app is running. In marketing Spectacles, Snap uses a mark that consists of a round, forward-looking, black-and-white cartoon eyeball that is typically displayed against a vibrant-yellow background and that is often placed near the word "Spectacles." The Court will refer to this mark as the "Spectacles Mark."

Eyebobs brought this action against Snap, alleging that Snap's use of the Spectacles Mark infringes Eyebobs' Registered Mark and Common-Law Mark. This matter is before the Court on Eyebobs' motion for a preliminary injunction. For the reasons that follow, Eyebobs' motion is denied.

# I.  BACKGROUND

Eyebobs was founded in 2001 with "the mission of offering high-quality and fashionable reading glasses at a reasonable price[.]"  ECF No. 1 ¶ 7.  Eyebobs' product line has since expanded to include sunglasses and frames for prescription lenses.  *Id.*  Eyebobs' products can be purchased online, through a mail-order catalog, or at eyewear boutiques and other stores.  Shirley Decl. ¶ 24; *see* Magerman Decl. ¶¶ 7-8.  The products generally sell for between $79 and $150.  Shirley Decl. ¶ 23.  Eyebobs also operates its own retail store in Minneapolis and plans to roll out additional retail stores over the next year.  Magerman Decl. ¶ 11; Shirley Decl. ¶ 15.  In marketing its products, Eyebobs consistently uses the Registered Mark or a similar combination of the eyeball logo with the word "Eyebobs." ECF No. 1 ¶ 8.  Snap contends—and Eyebobs does not seem to dispute—that the Common-Law Mark is not in use.  ECF No. 29 at 11; ECF No. 50 at 3:10-4:4.  In other words, the parties seem to agree that whenever the eyeball logo appears in commerce, it is accompanied in some way by the word "Eyebobs." *See* Shirley Decl. ¶¶ 8-18, 20.

Snap's mission is to "develop products that harness the power of cameras in ways that allow people to communicate, express themselves, and share their life experiences."  Horowitz Decl. ¶ 3.  Snap's first product was the Snapchat mobile app, which, as noted, allows users to record photographs and videos (called "Snaps") with

their smart phones and send them to other Snapchat users.  *Id.* ¶ 4.  A Snap appears on the receiver's screen for only a few moments before disappearing.  *Id.*  Snapchat users can also send chat messages, create visual "Stories" that remain on the user's account for one day, and store Snaps indefinitely as "Memories."  *Id.* ¶ 5.

In September 2016, Snap began advertising its new Spectacles product, which was described as "sunglasses that Snap" and marketed as a camera made "Just for Snapchat."  *Id.* ¶¶ 6, 10; ECF No. 1 ¶ 14.  A pair of Spectacles is essentially a hands-free recording device that allows users to take a Snap with the built-in camera and wirelessly add that Snap to the Snapchat app.  Horowitz Decl. ¶¶ 6-7.  A Snap recorded by a Spectacles camera may be viewed, edited, or shared only through the Snapchat app.  *Id.* ¶ 6.  Spectacles come with sun lenses that do not have vision-correcting capabilities, but the sun lenses can be replaced with prescription lenses.  ECF No. 1 ¶ 17. Spectacles retail for $129.99.  Horowitz Decl. ¶ 9.

Snap originally sold Spectacles through vending machines (called "Snapbots") located in various cities across the United States.  *Id.* ¶ 8; *see also* Routhier Decl. Ex. O. Snap also sold Spectacles through a temporary (and now closed) retail store in Manhattan.   Horowitz Decl. ¶ 8.  At present, Snap sells Spectacles online via the Spectacles.com website.  *Id.* ¶ 9.  In marketing Spectacles, Snap has used the Spectacles Mark, which Snap claims is a stylized depiction of the right lens of a pair of Spectacles.

*Id.* ¶ 11.  The Spectacles Mark is sometimes used by itself and sometimes used in conjunction with the word "Spectacles."  *Id.* ¶ 13.

## II.  ANALYSIS

Eyebobs contends that Snap's use of the Spectacles Mark infringes its trademarks, and Eyebobs now seeks to preliminarily enjoin Snap's continued use of the Spectacles Mark in its marketing of Spectacles.

### A.  Standard of Review

The Court considers four factors in deciding whether to grant a motion for a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the harm that the non-movant will suffer if the injunction is granted; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "In deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant."  *Laclede Gas Co. v. St. Charles Cty., Mo.*, 713 F.3d 413, 419-20 (8th Cir. 2013) (citation and internal quotations omitted).  "A preliminary injunction is an extraordinary remedy," and the party seeking a preliminary injunction bears the burden of establishing its entitlement to such relief under the *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted).

*B. Likelihood of Success on the Merits*

Eyebobs brings three claims against Snap.  First, Eyebobs sues Snap under § 35 of the Lanham Act for infringing the Registered Mark.  15 U.S.C. § 1114.  Second, Eyebobs sues Snap under § 43(a) of the Lanham Act for infringing the Common-Law Mark.  15 U.S.C. § 1125(a).  And third, Eyebobs sues Snap under Minnesota law for engaging in deceptive trade practices.  Minn. Stat. § 325D.44.  The Court will address these claims in turn.

1.  Infringement of a Registered Trademark

Eyebobs' main claim is that Snap is infringing the Registered Mark in violation of the Lanham Act.  ECF No. 1 ¶¶ 22-30.  There is no dispute that Eyebobs has valid ownership rights and a protectable interest in the Registered Mark.  *See* 15 U.S.C. §§ 1057(b), 1115(a); *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987).  Thus, whether Eyebobs is likely to succeed on its claim turns on whether Eyebobs will be able to prove that Snap's use of the Spectacles Mark creates "a likelihood of confusion, deception, or mistake on the part of an appreciable number of ordinary purchasers as to an association between [Eyebobs] and [Snap] due to their common use of the [trademarks]."  *Gen. Mills, Inc.*, 824 F.2d at 626.

In a typical trademark-infringement action, the plaintiff alleges that the defendant is causing forward confusion—that is, that the defendant is causing

consumers to mistakenly believe that the defendant's products are somehow affiliated with the plaintiff.  In such a case, the (junior) defendant is trying to take advantage of the goodwill associated with the (senior) plaintiff.  Imagine, for example, a startup shoe company that brands its athletic footwear with a logo that is deceptively similar to the Nike swoosh.

In this trademark-infringement action, however, Eyebobs alleges that Snap's continued use of the Spectacles Mark will cause reverse confusion.  Such confusion "occurs when a large junior user [here, Snap] saturates the market with a trademark similar or identical to that of a smaller, senior user [here, Eyebobs]."  *Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1246 (8th Cir. 1994) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992)).  The harm flowing from reverse confusion is that "[t]he public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. . . . [T]he senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets."  *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987).  To receive preliminary relief, then, Eyebobs must establish "that because of the similar marks, [Eyebobs'] customers are likely to mistakenly think that the more well known [Snap] is the source of, or is sponsoring or backing, [Eyebobs'] goods or services."

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10

(4th ed. 2017).

In both forward- and reverse-confusion cases, this Court must weigh the six

"*SquirtCo* factors" in determining whether there is a likelihood of confusion:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to pass off its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 887 (8th Cir. 2014)

(quotations omitted) (quoting *Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780

F.2d 1324, 1330 (8th Cir. 1985)); *see also A & H Sportswear, Inc. v. Victoria's Secret Stores,*

*Inc.*, 237 F.3d 198, 229, 234 (3d Cir. 2000) ("As in a direct confusion claim, the ultimate

question in a reverse confusion claim is whether there is a likelihood of consumer

confusion as to the source or sponsorship of a product.").[2]  No one factor is dispositive.

*Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir. 1999).  But the first three factors

are considered "pivotal" in reverse-confusion cases.  *Boldface Licensing + Branding v. By*

---

[2] In *A & H Sportswear, Inc.*, the Third Circuit adopted a ten-factor test for determining whether there is a likelihood of consumer confusion in a reverse-confusion case.  That ten-factor test has not been adopted by the Eighth Circuit, but it is quite similar to the *SquirtCo* test.  *See Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 760 n.2 (8th Cir. 2005) (recognizing the *A & H Sportswear* test and noting that the Third Circuit applies a multi-factor test similar to that used in the Eighth Circuit).

*Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1187 (C.D. Cal. 2013) (quoting *Dreamwerks Prod.*

*Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998)).

*a. The Strength of the Marks*

The first factor for the Court to analyze is the strength of the marks. *Luigino's,*

*Inc.*, 170 F.3d at 830. A mark's overall strength reflects both its conceptual strength and

its commercial strength. *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 864

(D. Minn. 2010). In a forward-confusion case—in which the defendant (the junior user)

is trying to take advantage of the plaintiff's (the senior user's) goodwill—the court's

focus is on the conceptual and commercial strength of the plaintiff's mark; the stronger

that mark, the more likely consumers will believe that the defendant's products are

associated with the plaintiff.

In a reverse-confusion case, however, the plaintiff (the smaller senior user) fears

that its mark will be overwhelmed when the defendant (the larger junior user) saturates

the market with its (infringing) mark. A *conceptually* strong mark still weighs in the

plaintiff's favor, "particularly when the mark is of such a distinctive character that,

coupled with the relative similarity of the plaintiff's and defendant's marks, a consumer

viewing the plaintiff's product is likely to assume that such a mark would only have

been adopted by a single source—i.e., the defendant." *A & H Sportswear, Inc.*,

237 F.3d at 232. But "the lack of *commercial* strength of the smaller senior user's mark is

to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000) (emphasis added). Thus, this Court will examine the conceptual strength of the Registered Mark and the commercial strength of the Spectacles Mark.

### i. Conceptual Strength of Registered Mark

In the Eighth Circuit, the conceptual strength of a mark depends on whether it is categorized as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996); *see also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). An arbitrary or fanciful mark receives the highest level of trademark protection, while a generic mark receives none. *Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc.*, 84 F.3d at 1096. Here, the Registered Mark—which comprises both the eyeball logo and the word "Eyebobs"—is at least suggestive and perhaps arbitrary or fanciful, and thus its conceptual strength is substantial.

### ii. Commercial Strength of Spectacles Mark

"[C]ommercial strength is based on the public recognition and renown of the mark as shown by the amount of advertising, sales volume, features and reviews in publications, and survey evidence." *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning,*

*Inc.*, 103 F. Supp. 3d 1032, 1042 (D. Minn. 2015) (internal quotation omitted). "[I]n a reverse confusion claim, a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." *A & H Sportswear, Inc.*, 237 F.3d at 231. In performing this evaluation, the court is to focus on "the class of customers and potential customers of a product or service[.]" *Zerorez Franchising Sys., Inc.*, 103 F. Supp. 3d at 1042 (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1375 (Fed. Cir. 2005)).

The evidence suggests that, at this point, the Spectacles Mark has very little commercial strength. As far as the record reflects, Snap has not engaged in sustained or large-scale advertising of Spectacles. Instead, Snap's promotion of Spectacles appears to have been limited to setting up temporary Snapbots, operating a single retail store (that is now closed), and selling Spectacles on a dedicated website ([www.spectacles.com](www.spectacles.com)). Nothing in the record suggests that, at present, the Spectacles Mark has anywhere near the commercial strength that would be necessary to overwhelm the Registered Mark—particularly among consumers who buy Eyebobs' products. (As will be discussed below, most potential buyers of Eyebobs' products are in a different demographic than the consumers at whom Snap aims its promotional efforts.)

Eyebobs does not seriously argue that the Registered Mark has already been overwhelmed, but instead argues that, in the future, the Spectacles Mark is likely to gain sufficient commercial strength to overwhelm the Registered Mark. In support of its contention, however, Eyebobs cites little more than the size and resources of Snap. But as Snap points out, large companies have often launched new products that have failed to find a wide audience—or any audience at all. There is nothing in the record (save vague statements that, at some point, Snap will be promoting Spectacles to some degree) that would suggest that the Spectacles Mark will ever gain sufficient commercial strength to overwhelm the Registered Trademark among consumers in the relevant market. *See Zerorez Franchising Sys., Inc.*, 103 F. Supp. 3d at 1042 (quoting *Palm Bay Imps., Inc.*, 396 F.3d at 1374-76)).

On balance, then, the Court finds that the strength-of-the-marks factor militates against a finding of likelihood of confusion.

*b. The Similarity of the Marks*

The Court next analyzes the similarities between the marks. *Luigino's, Inc.*, 170 F.3d at 830. "Rather than consider the similarities between the component parts of the marks, [the Court] must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." *Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc.*, 84 F.3d at 1097. In this

evaluation, the Court looks to "the marks' visual, aural, and definitional attributes and compare[s] the trade dress of the products [to determine] whether the total effect conveyed by the two marks is confusingly similar." *Luigino's, Inc.*, 170 F.3d at 830. Analysis under this factor is generally the same in reverse-confusion cases as it is in forward-confusion cases. *A & H Sportswear, Inc.*, 237 F.3d at 229.

Here, there is not a great deal of similarity between the Registered Mark and the Spectacles Mark. The Registered Mark is dominated by the word "Eyebobs," which clearly identifies the source of the product and greatly diminishes the possibility of confusion. *See Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1440 (S.D. Ohio 1990). The Spectacles Mark does not, of course, contain the word "Eyebobs." The only word used in the Spectacles Mark is "Spectacles," which does not remotely resemble the word "Eyebobs," and which appears in a substantially different font than the word "Eyebobs" in the Registered Mark.

For these reasons, the Court finds that the similarity-between-the-marks factor also militates against a finding of likelihood of confusion.

### c. The Degree to Which the Products Compete

The third factor requires the Court to examine to what extent Eyebobs' products compete with Spectacles. *Luigino's, Inc.*, 170 F.3d at 830. "Where products are wholly unrelated, this factor weighs against a finding that confusion is likely. Where products

are related, however, it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005). Infringement may be found even if there is little or no direct competition between the products or the parties because "confusion, not competition, is the touchstone of trademark infringement." *Mut. of Omaha Ins. v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987). The ultimate inquiry is whether or not customers are likely to associate the two product lines. *See Kemp*, 398 F.3d at 1056 ("[P]roper application of this factor requires exploration of the likelihood that consumers would draw a connection between the two products and be confused as to the identities of their respective sources."). In answering that question, a court considers the similarity of the products, target customers, marketing channels, and advertising. *See id.*; *Graham Webb Int'l v. Helene Curtis Inc.*, 17 F. Supp. 2d 919, 929 (D. Minn. 1998).

Like the first two factors, this factor also militates against a finding of likelihood of confusion. Eyebobs sells reading glasses. Those glasses are purchased by consumers—generally, consumers over the age of 40—who are seeking to correct their vision. Consumers find Eyebobs' products by looking for reading glasses on the Internet or at retail stores. A consumer looking for a pair of reading glasses will not stumble across Spectacles, even accidentally.

Snap markets what is really a hands-free recording device that can be used only with the Snapchat app. That device is purchased only by those who use Snapchat, and 85% of those who use Snapchat are ages 13-34 (58% are ages 13-24). Horowitz Decl. ¶ 4. Consumers purchase Spectacles not because they want to correct their vision—they're too young to need reading glasses,[3] and Spectacles do not come with corrective lenses—but because they want a more convenient way to take photographs and video. Most consumers find Spectacles by going to the Spectacles website or by happening upon a Snapbot. A consumer looking for Spectacles will not stumble across reading glasses, even accidentally.

In short, there is almost no overlap between the reading glasses marketed by Eyebobs and the Spectacles marketed by Snap. They are very different products that are sold to very different consumers through very different channels. The Court therefore finds that the competitive-proximity factor militates strongly against a finding of likelihood of confusion. *See, e.g., Davis v. Walt Disney Co.*, 430 F.3d 901, 904 (8th Cir. 2005); *Graham Webb Int'l*, 17 F. Supp. at 929.

---

[3]In a review of the Spectacles website, the Spectacles promotional video, and some of the many videos regarding Spectacles on YouTube, the Court was not able to spot a single gray hair.

*d. Snap's Intent To Confuse the Public*

The fourth factor analyzes whether Snap intended to pass off Spectacles as being affiliated with Eyebobs.  *Luigino's, Inc.*, 170 F.3d at 830.  "When reverse, rather than direct, confusion is alleged, 'intent to confuse' is unlikely to be present. . . . If such an intent to confuse does, in fact, exist in a reverse confusion case, it should weigh against the defendant in the same manner as it would in a direct confusion case."  *A & H Sportswear, Inc.*, 237 F.3d at 232 (internal citations omitted).

There is no evidence that Snap was even aware of the Registered Mark before Eyebobs threatened litigation, and no evidence that—before or after receiving Eyebobs' threat—Snap has intended to confuse the public.  Snap would have no *reason* to lead potential purchasers of Spectacles to believe that the product was affiliated with Eyebobs.  The Spectacles Mark was inspired by the Spectacles design; the fact that it resembles the Registered Mark is mere happenstance.  Horowitz Decl. ¶ 12.  Thus, the Court finds that the intent-to-confuse factor militates against a finding of likelihood of confusion.

*e. Evidence of Actual Confusion*

The fifth factor examines incidents of actual confusion.  *Luigino's, Inc.*, 170 F.3d at 830.  "Although such incidents are proof of the likelihood of confusion, the plaintiff is

not required to bring forth incidents of actual confusion to succeed in an infringement case." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010).

There is no evidence in the record that any consumer has formed the mistaken belief that an Eyebobs product was affiliated in some way with Snap. This is not surprising. As noted, Eyebobs products are not sold in proximity to Spectacles; no shopper will ever see them sitting next to each other on a shelf or appearing next to each other on a web page. Thus, for actual confusion to arise, Snap would first have to so saturate the market with the Spectacles Mark that even middle-aged and elderly consumers would be familiar with it. And then, of course, the Registered Mark would have to so closely resemble the Spectacles Mark that those consumers would have to be confused about whether Snap had gone into the reading-glasses business. As the Court has already found, however, the Spectacles Mark has little commercial strength and does not closely resemble the Registered Mark.

To further bolster its case, Snap commissioned two consumer surveys. The first survey—the *Eveready* survey—establishes what everyone already knows: A consumer who is shown the Registered Mark is highly unlikely to think that it has anything to do with Snap. This simply confirms that the Spectacles Mark has not saturated the market and overwhelmed the Registered Mark. *See* 4 MCCARTHY, *supra*, § 23:10. The second survey—the *Squirt* survey—purports to show that consumers who are shown the

Spectacles Mark and the Registered Mark in close proximity do not confuse the two any more than they confuse a non-infringing control mark shown in close proximity with the Registered Mark. Eyebobs is highly critical of the *Squirt* study. Even assuming that Eyebobs' criticisms have merit, however, the record remains devoid of any evidence of actual confusion.

That said, the Court recognizes that evidence of actual confusion will almost never exist in a reverse-confusion case when, as here, the senior user seeks a preliminary injunction to *prevent* the junior user from saturating the market with the allegedly infringing mark. *See Boldface Licensing + Branding*, 940 F. Supp. 2d at 1194. Given this difficulty, the absence of such evidence in a reverse-confusion case is "generally unnoteworthy and is given little probative weight." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) (internal quotation omitted). At bottom, then, the Court finds that the actual-confusion factor does not militate strongly for or against a finding of likelihood of confusion.

### f. Conditions of Purchase

The final factor examines the conditions of purchase—and, in particular, the degree of care that is taken by potential customers. *Luigino's, Inc.*, 170 F.3d at 830. When considering this factor, the Court is to stand "in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving

the attention such purchasers usually give in buying that class of goods." *Id.* at 831 (quotation marks omitted) (quoting *Gen. Mills, Inc.*, 824 F.2d at 627). "[T]his factor is important in this case because it tends to mitigate any potential confusion." *Sensient Techs. Corp.*, 613 F.3d at 769.

Here, consumers are purchasing expensive products, and they are likely to take care to ensure that they are getting exactly what they want. Spectacles retail for $129.99, and a consumer seeking to purchase Spectacles is going to ensure that she gets the one-and-only hands-free recording device that pairs with the Snapchat app. There is little chance that someone looking for a pair of Spectacles will mistakenly believe that the product is affiliated in some way with Eyebobs.

Eyebobs' reading glasses are typically priced between $79.00 and $150.00. Given that reading glasses are widely available on the Internet and at discount and drug stores for $5.00 to $10.00, customers who buy Eyebobs are buying more than functionality; as Snap's counsel put it, "what they're buying is identity" and "[w]hen you are buying identity, you put a lot of care into it." ECF No. 50 at 48:22-25. There is little chance that someone looking for a pair of Eyebobs reading glasses will mistakenly believe that the product is affiliated in some way with Snap.

For these reasons, the Court finds that the conditions-of-purchase factor militates against a finding of likelihood of confusion.

*g. Conclusion*

In sum, five of the six *SquirtCo* factors militate against a finding of likelihood of confusion, and the remaining factor is neutral. Under the circumstances, the Court cannot find that Eyebobs is likely to prevail on its claim that Snap has infringed the Registered Mark.

## 2. Infringement of a Common-Law Trademark

Eyebobs also claims that Snap infringed the Common-Law Mark. (Eyebobs' claim is formally brought as a false-designation-of-origin claim under § 43(a) of the Lanham Act. 15 U.S.C. § 1125(a).) To succeed on this claim, Eyebobs must establish that Snap's use of the Spectacles Mark is likely to cause consumers to mistakenly believe that Eyebobs or its products are affiliated with Snap.[4]

The Court's analysis of whether Snap's use of the Spectacles Mark infringes the Common-Law Mark closely tracks the Court's analysis of whether Snap's use of the Spectacles Mark infringes the Registered Mark. Only two differences are worth mentioning:

---

[4]Snap apparently denies that Eyebobs *has* a common-law trademark protecting the eyeball logo. The Court need not decide the issue, however, because even assuming that Eyebobs is likely to succeed in establishing that it has a common-law trademark, *see First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040 (8th Cir. 1996), Eyebobs is not likely to succeed in showing that Snap has infringed that trademark.

First, the conceptual strength of the Common-Law Mark is probably not as strong as the conceptual strength of the Registered Mark, given that the Common-Law Mark is suggestive, *see* ECF No. 50 at 6:15-7:5, 38:11-18, while the Registered Mark may be arbitrary or fanciful. This helps Snap.

Second, because it consists of only the eyeball logo (and not the word "Eyebobs"), the Common-Law Mark is more similar to the Spectacles Mark than is the Registered Mark—at least when the Spectacles Mark is used without the word "Spectacles." This helps Eyebobs, but not much.

There are a number of differences between the eyeball logo that makes up the Common-Law Mark and the eyeball logo that makes up the Spectacles Mark. The Eyebobs eyeball is oval and looks up; the Spectacles eyeball (which Snap says is not an eyeball, but a sunglass lens[5]) is circular and looks straight ahead. The white "cut out" of the iris of the Eyebobs eyeball always appears at the 9:00 position and evokes light reflecting off the eye from the left; the white cut out of the iris of the Spectacles eyeball always appears at the 11:00 position and evokes the built-in camera. And the Eyebobs eyeball usually appears against a golden-yellow background; the Spectacles eyeball usually appears against a vibrant-yellow background. *See Luigino's, Inc.*, 170 F.3d at 831

---

[5]Snap's argument is belied by the fact that the Spectacles logo clearly has a sclera. A sunglass lens does not have a sclera.

("The use of different colors and typefaces, as well as the prominent display of the house marks convey perceptible distinctions between the products.").

Moreover, as Snap points out in its briefing, the marketplace is crowded with cartoonish, black-and-white eyeballs. ECF No. 29 at 18. Consumers are generally sophisticated when it comes to differentiating such marks. *See Gen. Mills, Inc.*, 824 F.2d at 626. That is especially true when, as here, consumers are purchasing expensive products and are likely to take care to ensure that they are getting exactly what they want.

Neither of these two differences materially changes the Court's analysis of the *SquirtCo* factors. And thus, for essentially the same reasons why the Court found that Eyebobs is unlikely to be able to prove infringement of the Registered Mark, the Court also finds that Eyebobs is unlikely to be able to prove infringement of the Common-Law Mark.

### 3. Minnesota Deceptive Trade Practices Act ("MDTPA")

Finally, Eyebobs alleges that Snap violated the MDTPA, which prohibits—among other things—"pass[ing] off goods or services as those of another;" "caus[ing] likelihood of confusion or of misunderstanding as to the source . . . of goods or services;" and "engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44, subd. 1. "A claim under

Minnesota Statute § 325D.44 requires the same analysis as does [a claim under] the federal Lanham Act." *i-Systems, Inc. v. Softwares, Inc.*, No. Civ. 02-1951 (JRT/FLN), 2004 WL 742082, at *15 (D. Minn. Mar. 29, 2004); *see also Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999) ("Plaintiffs' claim for deceptive trade practices is governed by Minnesota Statute § 325D.44, which requires the same analysis as the federal Lanham Act."). Hence, the Court finds that Eyebobs is unlikely to succeed on its MDTPA claim for the same reasons that the Court found that Eyebobs is unlikely to succeed on its Lanham Act claims.

## C. Irreparable Harm

If a plaintiff in a trademark-infringement action succeeds in showing a likelihood of confusion, the Eighth Circuit has traditionally applied a presumption of irreparable harm. *See Warner Bros. Entm't, Inc. v. X One X Prods.*, 840 F.3d 971, 982 (8th Cir. 2016); *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987). It is not clear whether this presumption survives the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). The Eighth Circuit applied the presumption in *Warner Brothers* (which was decided long after *eBay*), but that decision did not cite *eBay*, much less discuss its possible impact on the presumption.

The Court need not address this issue, however, because even if the presumption survives in the Eighth Circuit, the presumption applies only when the court finds a

likelihood of confusion. *Warner Bros. Entm't, Inc.*, 840 F.3d at 982 (8th Cir. 2016); *see also United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1184 (8th Cir. 1998) ("Absent [a showing of a tendency to deceive], however, irreparable harm cannot be presumed where, as here, plaintiff has not established any prospect of success upon the merits."). In this case, the Court has not found a likelihood of confusion.

To succeed in establishing a threat of irreparable harm, then, Eyebobs must point to evidence demonstrating "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Eyebobs has demonstrated that it would be harmed if reverse confusion were to occur—but, as discussed above, Eyebobs has not demonstrated that reverse confusion is likely to occur during the pendency of this lawsuit. The Court cannot find an imminent threat of irreparable harm.

### D. Balance of Harms and the Public Interest

The Court next balances the harm that Eyebobs will suffer if no preliminary injunction is entered against the harm that Snap will suffer if a preliminary injunction is entered. *Dataphase Sys., Inc.*, 640 F.2d at 113. For the reasons already explained, the Court does not believe that Eyebobs will suffer any harm while this lawsuit is pending if a preliminary injunction is not entered. By contrast, Snap would be unable to use millions of dollars worth of merchandise that now bears the Spectacles Mark if a

preliminary injunction is entered.  *See* Horowitz Decl. ¶ 16.  This factor militates against

the entry of a preliminary injunction.

Finally, the Court cannot discern how the public interest would be served by

entry of a preliminary injunction.

## III. CONCLUSION

Eyebobs is not likely to succeed on the merits of any of its claims, and, "[w]ith no

likelihood of success on the merits, there is little justification for granting a preliminary

injunction."  *CDI Energy Servs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 402

(8th Cir. 2009).  Moreover, Eyebobs has failed to demonstrate that it is likely to suffer

irreparable harm if Snap is not enjoined from using the Spectacles Mark while this

lawsuit is pending.  Accordingly, the Court denies Eyebobs' motion for a preliminary

injunction.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT Plaintiff's motion for a preliminary injunction

[ECF No. 16] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 8, 2017                                  s/Patrick J. Schiltz
                                                     Patrick J. Schiltz
                                                     United States District Judge